UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOHN J. HEIM,

                    Plaintiff,

          -v-                          1:18-CV-836

BETTY DANIEL and
ADRIAN MASTERS,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                    OF COUNSEL:

COOPER, ERVING & SAVAGE, LLP     PHILLIP G. STECK, ESQ.
Attorneys for Plaintiff
39 North Pearl Street, 4th Floor
Albany, NY 12207

NOLAN HELLER KAUFFMAN, LLP      BRIAN DEINHART, ESQ.
Attorneys for Plaintiff
80 State Street, 11th Floor
Albany, NY 12207

HON. LETITIA JAMES              MELISSA A. LATINO, ESQ.
New York State Attorney General  SHANNAN COLLIER
Attorneys for Defendants             KRASNOKUTSKI, ESQ.
The Capitol                     Ass't Attorneys General
Albany, NY 12224

DAVID N. HURD
United States District Judge

## TABLE OF CONTENTS

**I. INTRODUCTION** ............................................................................. **3**

**II. BACKGROUND** ............................................................................. **4**
   A.  Professional Background ...............................................................5
   B.  Teaching Experience ....................................................................7
   C.  SUNY Albany ..............................................................................8
   D.  Yue Li ..........................................................................................9
   E.  Lewis Segal ............................................................................... 10
   F.  Ben Griffy ................................................................................. 11

**III. LEGAL STANDARD** ................................................................. **15**

**IV. DISCUSSION** ............................................................................. **16**
   A.  Academic Freedom ................................................................... 18
   B.  Retaliation ................................................................................ 23
       1.  Protected Speech or Conduct ........................................ 24
           i.  *Garcetti* ................................................................. 27
           ii.  *Pickering* and *Connick* .......................................... 31
       2.  Adverse Action ............................................................... 35
       3.  Causation ....................................................................... 37
   C.  Limited Public Forum ............................................................. 42

**V. CONCLUSION** ........................................................................... **43**

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

On July 16, 2018, plaintiff John J. Heim ("Heim" or "plaintiff"), an adjunct professor at the State University of New York ("SUNY") at Albany, filed this 42 U.S.C. § 1983 action against defendants SUNY Albany, the SUNY system, SUNY Albany President Havidan Rodriguez ("President Rodriguez"), SUNY Albany professor Betty Daniel ("Daniel"), and SUNY Albany professor Adrian Masters ("Masters").  Dkt. No. 3.

Heim's three-count amended complaint alleged that defendants violated his civil rights under the First and Fourteenth Amendments to the U.S. Constitution and the New York State Human Rights Law when they refused to interview or hire him for a tenure-track faculty position in the economics department at SUNY Albany.  Dkt. No. 4.

On September 28, 2018, defendants moved under Federal Rule of Civil Procedure 12(b) to dismiss Heim's amended complaint.  Dkt. No. 9.  After oral argument, defendants' motion was granted in part and denied in part in a decision rendered from the bench.  Dkt. No. 17.  Plaintiff's § 1983 claim against President Rodriguez (Second Cause of Action) was dismissed.  *Id*.  So

too was plaintiff's Human Rights Law claim for age discrimination against SUNY Albany and the SUNY system (Third Cause of Action).[1]  *Id.*

Thereafter, the parties completed discovery into Heim's First Cause of Action; *i.e.*, his § 1983 claim that defendants Daniel and Masters, the two SUNY Albany professors responsible for making hiring decisions in the economics department, violated his First Amendment rights.[2]  Dkt. No. 18.

On January 31, 2022, Daniel and Masters (collectively "defendants") moved under Federal Rule of Civil Procedure 56 for summary judgment on this remaining claim.  Dkt. No. 73.  The motion has been fully briefed and will be considered on the basis of the submissions without oral argument.

## II. **BACKGROUND**

Defendants have filed a Statement of Material Facts in accordance with the Local Rules, but a review of Heim's response to this document reveals that he partially or completely denies (and frequently disputes the

---

[1]  In his opposition to the pre-answer motion to dismiss, Heim also conceded that his claims against SUNY Albany and SUNY were barred by state sovereign immunity.  Dkt. No. 12 at 3.  And as mentioned *supra*, plaintiff's claim for prospective injunctive relief against President Rodriguez has been dismissed.  Although it is not clear from the docket sheet, there are no claims remaining against these three parties.  *See* Defs.' Answer, Dkt. No. 18 (joining issue on behalf of defendants Daniel and Masters only).  Accordingly, the Clerk of the Court will be directed to terminate these parties as defendants.

[2]  Heim's amended complaint also set forth a "reserved" space for a fourth cause of action in anticipation of a further amendment to his pleading that would include a claim based on the Age Discrimination in Employment Act ("ADEA").  Am. Compl. ¶¶ 58–60.  However, a review of the docket sheet indicates that plaintiff did not follow through with any further amendment to his pleading.  Accordingly, the Court declines to consider any claim under the ADEA.

characterization of) most of the factual assertions set forth in defendants' filing.  *See* Pl.'s Response to Defs.' Facts, Dkt. No. 73-1.  Because of the Court's obligation to resolve fact disputes in the non-movant's favor on summary judgment, most of the background set out in this section is taken from plaintiff's affidavit in opposition and from his own deposition testimony.

### A.  **Professional Background**

Heim holds a Ph.D. in political economy from SUNY Albany and a master's degree in Public Administration from Harvard University.  Heim Aff., Dkt. No. 73-2 ¶ 5.  Plaintiff has also received certificates in executive leadership, construction management, double-entry governmental accounting, and audit training.  *Id*. ¶ 6.

Heim has worked as an econometrician in various New York State agencies and for the City of Buffalo.  Heim Aff. ¶ 7.  He considers himself a macroeconomist, which involves the study of whole economies; *i.e.*, it is "the part of economics concerned with large-scale or general economic factors and how they interact."  *Id*. ¶ 17.

Heim also considers himself a Keynesian[3], which in his view places him on the traditionalist side of a long-running "intellectual battle" with a separate

---

[3] So named for John Maynard Keynes, a British economist whose work during the Great Depression departed from the classical view that in the long run the economy would achieve general equilibrium without the need for government intervention.  Heim Aff. ¶ 18.  Keynes, in contrast to his contemporaries, advocated for countercyclical fiscal policies that would prop up aggregate demand in a depressed economy.  *See id*.

group of economists who prefer to study Dynamic Stochastic General Equilibrium ("DSGE"), "a method that uses sophisticated mathematics such as logarithms to derive the behavior of the macro economy from the micro economy." Heim Aff. ¶¶ 18, 22, 24.

As Heim explains, DSGE is popular among the so-called "freshwater economists," who study and teach at universities located in the interior of the United States, while traditional Keynesian theory has historically enjoyed "greater allegiance" among "saltwater economists," who study and teach at universities located on the coasts. Heim Aff. ¶ 24. Adherents to DSGE (also known as the "micro foundations of macro") criticize Keynesianism as an outdated theory because, *inter alia*, it failed to provide a suitable policy response to the severe stagflation of the 1970s.[4] *See id.* ¶¶ 18–24.

However, Keynesians—including Heim—dispute the explanatory power of DSGE's approach. *See* Heim Aff. ¶ 23. They believe that DSGE's emphasis on "equilibrium is an effort to revive neo-classical free market economic theory." *Id.* They also believe that this kind of thinking "paralyzed the ability of economists to respond to events like the Great Depression or the Financial Crisis of 2008." *Id.* Plaintiff asserts that Keynesianism "remains a

---

[4] One prominent critic is the American economist Robert E. Lucas, Jr., for whom the "Lucas critique" is named. In the wake of this and other criticisms, a group of economists known as "New Keynesians" have sprung up. They "try to bridge the gap" between traditional Keynesian analysis and DSGE. Heim Aff. ¶ 24 n.6.

respected point of view worldwide" and firmly believes that "[y]oung economists need access to both points of view to prepare for the economic future."  *Id*. ¶ 26.

Heim's particular area of research is "Hicksian IS-LM" type analysis, which is a kind of Keynesianism that involves "a highly detailed statistically based look at how the economy operates."  Heim Aff. ¶ 27.  From this statistical information, plaintiff is able to "develop equations to create a model for how the whole economy works."  *Id*.  Unlike plaintiff, defendants Daniel and Masters adhere to the DSGE or "micro foundations of macro" approach to economics.  *Id*. ¶ 31.  In plaintiff's view, Daniel and Masters "are hostile to traditional Keynesian analysis."  *Id*.

## B.  <u>Teaching Experience</u>

In 1997, Rensselaer Polytechnic Institute ("RPI") hired Heim as a clinical professor in its economics department.  Heim Aff. ¶ 8.  Plaintiff taught economics at RPI from 1998 to 2012.  *Id*.  In particular, plaintiff "taught Masters and Ph.D.-level Advanced Microeconomics I & II and Master's level Econometrics."  *Id*.  Plaintiff also "supervised 100 senior theses, four masters' theses, and three doctoral dissertations."  *Id*. ¶ 9.

RPI promoted Heim on several occasions, and over the years he eventually received the title of full clinical professor.  Heim Aff. ¶ 8.  According to plaintiff, the duties of a full clinical professor at RPI were limited to teaching

and administration.  *Id.*  Because a clinical teaching position did not offer
tenure, "RPI made no decision on granting or denying [him] tenure."  *Id.*

Notably, in 1997 Heim also taught a class in macroeconomics to
undergraduates at SUNY Albany.  Heim Aff. ¶ 11; Ex. A to Latino Decl.
("Heim Dep."), Dkt. No. 68-3 at 35:2–3, 36:21–34:2.  According to plaintiff, he
was recruited to do so by Kajal Lahiri, "a noted econometrician and the
highest-ranking professor in the economics department," and by Terry Kinal,
another econometrician who was at that time the chair of SUNY Albany's
economics department.  Heim Aff. ¶ 10.

## C.  SUNY Albany

Later, in 2012, SUNY Albany hired Heim as an adjunct professor in its
economics department.  Defs.' Facts, Dkt. No. 68-1 ¶ 1; Heim Aff. ¶ 11.  As
plaintiff explains, he "came to SUNY Albany to reduce [his] teaching course
load and concentrate more on [his] research," which "focused on large-scale
macroeconomic modeling and whether particular economic ideas or models
conformed to reality based on statistical testing."  Heim Aff. ¶ 10.

During his first semester at SUNY Albany, Heim taught a class on
large-scale macroeconomic modeling to both undergraduate and graduate
students.  Heim Aff. ¶ 11; Heim Dep. 38:19–39:5.  However, when defendant
Daniel became the chair of the economics department she "denied [plaintiff]
the opportunity to continue teaching that class."  Heim Aff. ¶ 11.

"After losing that opportunity, up until June 2021, [Heim] was teaching a full course load (two courses) at SUNY equal to that of tenure-track faculty including, from time to time, Principles of Macroeconomics and Economic Statistics."  Heim Aff. ¶ 11; *see also* Heim Dep. at 38:8–70:9 (describing courses taught each semester during this time period).

In 2017 and 2021, Heim also wrote a total of four books, which were published by "Macmillan Palgrave Co., a renowned academic publisher" and listed in the *Journal of Economic Literature*, which highlights significant publications in the field of economics."  Heim Aff. ¶ 12.  These books received favorable reviews.  *See id.* ¶ 13.  One of these books, entitled *Crowding Out Fiscal Stimulus*, was publicized by SUNY Albany.  *Id.* ¶ 14.  Plaintiff was also honored by the university for his publications.  *Id.*  According to plaintiff, "no member of the macroeconomics faculty has published any books since the department's creation in the 1960s."  *Id.*

**D.  Yue Li**

On December 17, 2013, Heim learned about a macroeconomics job opening in the economics department at SUNY Albany.[5]  Heim Aff. ¶ 43.  When

---

[5]  Heim believes that "[t]he people who call themselves macroeconomists at SUNY Albany" do not actually study or research true macroeconomics.  Heim Aff. ¶ 28.  In plaintiff's view, these professors "look at much smaller parts of the economy, like the labor market, or particular practices in the health care market, and analyze certain behaviors in it."  *Id.*  While "[t]his type of work is particularly suitable for publication in various journals in rather short articles," plaintiff insists that this kind of work "did not used to be called macroeconomics at all."  *Id.*

plaintiff "asked then economics department chair [Daniel] about it, she

discouraged him from applying." *Id*.  In an e-mail to plaintiff, Daniel stated:

> Thanks for your interest in the macro position.  You
> are correct that we are heavily invested in micro
> foundations of macro as this is the research trend in
> the top macro and general field journals.  Since we
> expect our faculty to publish in these journals, we do
> intend to continue with this direction.
>
> I did consult with Adrian [Masters] and John and we
> agree with you that your research differs from the
> course of research we want to pursue.  I expect that we
> will hire a junior person recently trained in these
> techniques.
>
> I do want to encourage you to continue your research.
> It just does not match with the direction we are taking
> macro research in the Department.

Ex. F to Heim Aff., Dkt. No. 73-8.  The economics department hired Yue Li to

fill this position.  Heim Aff. ¶ 43.

## E.  Lewis Segal

In 2016, Heim learned that "a positon [*sic*] at the University of Albany in

financial economics had been created and filled with another younger adjunct

faculty member."  Heim Aff. ¶ 44.  Despite his "background in financial

economics," no one mentioned to plaintiff "that a position had been created

until after it was filled."  *Id*.  According to plaintiff, "the department sought

and obtained a waiver of the normal competitive hiring process from the

University administration."  *Id*.

Heim did not apply for this job.  Heim Dep. at 105:2–8.  Instead, the

department hired Lewis Segal to fill this position.  *Id*.  Plaintiff concedes that

Segal was also qualified, but believes himself to have been equally or "maybe

a little bit more" qualified for it.  Heim Dep. at 101:23–102:7.

### F. <u>Ben Griffy</u>

On August 24, 2017, Heim learned of yet another job opening in the

economics department during a luncheon with Daniel and Masters.  Heim

Aff. ¶ 45.  Neither Masters, who had become chair of the economics

department in 2016, nor Daniel, who headed up the search committee for this

particular job opening, had advised plaintiff of the posting "even though both

work within about 100 feet of [his] office" and pass him regularly in the

university's hallways.  *Id*.; *see also* Heim Dep. at 72:17–22.  According to

plaintiff, defendant Daniel "told [him] flat out that he was too old to be

considered for a tenure-track position."  *Id*.

On October 27, 2017, Heim submitted an application for the job posting

anyway.  Heim Aff. ¶ 46.  He received a confirmation e-mail from SUNY

Albany's Office of Human Resources.  Ex. G to Heim Aff., Dkt. No. 73-9.  He

also informed Masters, the chair of the economics department, that he had

applied for the job.  Heim Aff. ¶ 46.  Although plaintiff was "much more

highly qualified," he was not interviewed.  *Id*.

On December 14, 2017, Heim asked Masters why he had not been selected for an interview.  *See* Heim Aff. ¶ 48.  According to plaintiff, Masters told him that he was not considered because his recommendations had not been received by the cut-off date.[6]  *Id*. ¶¶ 47–48.  As plaintiff explains, a third-party entity responsible for compiling application materials—referred to by him as a clearinghouse—received "two of the recommendations" but "did not forward them to the University" for consideration.  *Id*. ¶ 49.

Heim contends this occurred because of a technical glitch with the clearinghouse's website, because when he conducted his own search for the job opening it "came up empty."  Heim Aff. ¶ 50.  According to plaintiff, other faculty members he routinely saw around the office knew he had applied for the position and should have advised him about the problem with his "missing" recommendations.  *Id*. ¶ 49.  Plaintiff submitted to Masters a statement from the clearinghouse that showed, in plaintiff's view, there was an error with the system.  *Id*. ¶ 50; Ex. I to Heim Aff., Dkt. No. 78-11.

On December 19, 2017, Masters responded by e-mail to Heim's complaint about the clearinghouse.  Heim Aff. ¶ 51.  Masters denied "that there was any problem with the clearinghouse."  *Id*.  Masters further stated that he and the

---

[6]  The cut-off date for the application was actually March 15, 2018.  Heim Aff. ¶ 47.

committee had considered whether to interview plaintiff irrespective of the

fact that they had not received his recommendation letters:

> We are bound by university rules to consider all applicants the same way. That you have direct access to me does not mean that you should get preferential treatment. Here is my final word on this matter:
>
> The department respects you and respects the fact that you continue to conduct your research as an adjunct professor. The technical reason we put down for not interviewing you is that we did not have letters and I told you that at the party. At the party I also gave you the "Cliff Notes" on the general feeling of the committee towards your application. Until now I have not given you chapter and verse because I am still happy to have you as a member of the department but you have now forced my hand on this. The fact is the committee did discuss your application and, as with many applicants with a track record, concluded that regardless of what any letters said we would not interview you for the position. Here is why:
>
> We are looking for someone who:
>
> 1. Can teach and train students to conduct research in the modern (i.e. post Lucas Critique) macroeconomics that by your own admission everyone else but you and Ray Fair do. Nothing in your credentials supports that possibility.
>
> 2. Has a reasonable expectation of making tenure within the department within the 6 year tenure track window. Here again the fact that you have a record speaks for itself. Nothing a letter writer can do can change that. The journals in which you have published do not achieve the standard that we expect for tenure. (Typically 4 articles in journals at the level of top field e.g. Journal of

> Monetary Economics or the International Economic Review.
>
> 3. Has sufficient synergies with our research agendas that we can learn from them and them from us with the possibility of constructive collaboration.  Your work is not consistent with that expectation.  Indeed, we rejected a number of applications that met the first 2 criteria but they do New Keynesian macro that we do not appreciate.
>
> I hope you are not too discouraged by this and continue to teach and do your work within the department as an adjunct professor but the fact is that you will not be hired for this job.  Meanwhile there were perhaps close to 100 jobs for macroeconomics posted in JOE.  I would encourage you to apply to as many of those as possible.  One of them might be a god [*sic*] fit for you but ours is not.
>
> I will not respond to anymore [*sic*] correspondence on this matter.  As far as the committee is concerned the matter is closed.  To respond any more to you would be to give you preferential treatment over other applicants.

Ex. J. to Heim Aff., Dkt. No. 78-12 (some formatting supplied).

On December 20, 2017, Heim responded to Masters and requested that he reconsider the department's refusal to interview him.  Heim Aff. ¶ 54.  As part of this request, plaintiff noted that DSGE economics "had come under heavy criticism within the profession" and stated his view that SUNY Albany "would benefit from having a recognized alternative, or at least by having a

healthy debate on these issues." *Id*.  Although plaintiff included statements

from prominent DSGE critics, Masters dismissed them as "old guys!" *Id*.

Ultimately, the department hired Ben Griffy to fill this position.  Heim

Aff. ¶ 46.  According to plaintiff, Griffy is less qualified than him.  Heim Dep.

at 107:19–108:6, 119:20–23.  Plaintiff continues to be employed as an adjunct

faculty member in SUNY Albany's economics department.[7]  *See, e.g.*, Heim

Dep. at 68:19–20.

## III.  LEGAL STANDARD

The entry of summary judgment is warranted "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  FED. R. CIV. P. 56(a).  An issue of fact is

material for purposes of this inquiry if it "might affect the outcome of the suit

under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  And a dispute of material fact is genuine "if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Id*.

In assessing whether there are any genuine disputes of material fact,

"a court must resolve any ambiguities and draw all inferences from the facts

in a light most favorable to the nonmoving party."  *Ward v. Stewart*, 286 F.

Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted).  Summary judgment is

---

[7] *See also Other Faculty and Staff,* University at Albany, State University of New York, https://www.albany.edu/economics/faculty/other-faculty-and-staff (last visited April 21, 2022).

inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

## IV. **DISCUSSION**

In their briefing, the parties spend time sparring over whether Keynesian economics is an "antiquated" field of study or whether Keynesian economists "use[ ] dated techniques." Defs.' Facts ¶ 8; *see also, e.g.*, *id.* ¶ 12 ("Keynesian economics has not been published in serious journals since the 70's."); ¶ 20 (characterizing academic journals in which plaintiff has published as "lower-tier"); Defs.' Reply, Dkt. No. 77 at 11 (analogizing a Keynesian economist to a physicist "who teaches and advocates for the 'flat Earth' theory); Masters Decl., Dkt. No. 77-1 ¶ 19 (comparing DSGE methods to "engineer[ing] an Instant Pot (for fast and efficient cooking)" and contrasting a Keynesian's methodological approach to "rubbing two sticks together for fire as the best source  of heating food").

But much of this is irrelevant. Heim's claim is based on a relatively straightforward premise. As plaintiff explained at his deposition:

> Q. So Professor Heim, why did you decide to sue Betty
>    Daniel [and defendant Masters]?
>
> . . . .
>
> A. Okay. Well, I was at Albany. They were recruiting
>    macroeconomics beginning level, macro-economics

professor.  And I knew I was more than qualified for at least for consideration, but, in fact, more than qualified by a long stretch, probably than any other applicant would be.  And yet they refused to entertain my application.

So I couldn't figure it out.  It could not have been on the substance by lacking substance in all the areas that a macro professor is expected to know.  So I figured it had to be something other than the knowledge of the job.

And the only thing I could think of is, they are a different kind of economist than I am.  They are what - - what is commonly called D.S.G.E. economist, she and Adrian [Masters], which is - - which is like a con - - very conservative school of economics.

And my type of economics is Keynesian, which is considered a more liberal type of economics . . . . And they had made clear to me that they did not want a person with that kind of background in the department.

. . . .

Q. And do you believe that you were denied the three positions that we've discussed . . . because of your endorsement of Keynesian economics?

A. Yes.

Heim Dep. 76:5–77:9, 122:16–21.

In other words, Heim alleges that defendants refused to consider him for a tenure-track faculty job for which he was otherwise qualified because they are biased against his economic viewpoint and the academic speech and

writing activities related to it.  Understanding this claim does not require the reader to form any concrete opinions about the internecine conflict over arcane theory that is apparently being waged in university economics departments across the country.

Instead, the difficult question posed by this § 1983 claim is which First Amendment framework should govern the legal analysis.  That question, in turn, is layered with extra complexity because Heim has taken such a broad approach to his protected "speech" that it threatens to frustrate meaningful legal analysis.  After all, plaintiff has been teaching, writing, and advocating for Keynesian economic concepts—in SUNY classrooms and outside of them—since well before 2012, when he first joined SUNY Albany's faculty.

### A. <u>Academic Freedom</u>

As an initial matter, to the extent Heim's § 1983 claim is based on the general First Amendment right of "academic freedom," that claim must be dismissed.

"The general right to academic freedom is a 'First Amendment protection that has long been recognized in the academic arena.'"  *Radolf v. Univ. of Conn.*, 364 F. Supp. 2d 204, 215 (D. Conn. 2005) (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003)).  It "rests on a recognition of 'the vital role in a democracy that is played by those who guide and train our

youth.'" *Burt v. Gates*, 502 F.3d 183, 190 (2d Cir. 2007) (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957)).

"[F]or decades it has been clearly established that the First Amendment tolerates neither laws nor other means of coercion, persuasion or intimidation 'that cast a pall of orthodoxy' over the free exchange of ideas in the classroom." *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 598 (2d Cir. 1990) (internal citations omitted) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)).

Even so, "courts understandably have been hesitant to define the precise contours of the First Amendment right to academic freedom." *Radolf*, 364 F. Supp. 2d at 215 (collecting cases). "The right to academic freedom is often formulated as a right of a university or other academic institution to be free from government interference with its curriculum and its decisions on who may or may not teach or be admitted to study." *Id.* at 216 (same).

Measured against this particular body of First Amendment law, Heim has not marshaled evidence from which a reasonable jury could find in his favor on this kind of § 1983 claim. To be sure, in some limited instances "courts have acknowledged that an individual professor or student possesse[s] an individual right to academic freedom." *Radolf*, 364 F. Supp. 2d at 216; *see also Burt*, 502 F.3d at 190–91 (summarizing instances in which this general right to academic freedom can be implicated); *but see Urofsky v. Gilmore*, 216

- 19 -

F.3d 401, 410 (4th Cir. 2000) (concluding that this generalized right "inheres in the University, not in individual professors").

For instance, in *Dube v. State University of New York*, the Second Circuit "upheld the right of a teacher, in a course on racism, to express the view that Zionism was a form of racism . . . despite the offensiveness of the teacher's viewpoint to some students and some members of the community." *Vega v. Miller*, 273 F.3d 460, 467 (2d Cir. 2001) (explaining that "*Dube* serves as a caution to governmental administrators not to discipline a college teacher for expressing controversial, even offensive, views").

However, as defendants correctly emphasize in their opening brief, Heim does not claim that he was prohibited from, or even admonished for, teaching or advocating for Keynesianism or Keynesian economic principles in any of the various classes he taught and continues to teach at SUNY Albany.  Nor does he allege any interference from faculty or administrative personnel with respect to his teaching methods, his publication of articles and books, or even with his in- or out-of-classroom speech and advocacy.

In his opposition, Heim contends that this claim should not be dismissed because defendant Daniel "removed" him from teaching an economics class on large-scale macroeconomic modeling when she first became chair of the

economics department.  Pl.'s Opp'n, Dkt. No. 73 at 26–27.[8]  Defendants reply

that this is a mischaracterization of the event.  *See* Defs.' Reply at 5.  In their

view, plaintiff was not "removed" from teaching this course; instead, "[h]is

contract to teach the advanced level course was simply not renewed the

following year."  *Id*. (quoting Masters Decl., Dkt. No. 77-1 ¶ 30).

Even assuming for the purpose of summary judgment that defendant

Daniel in fact "removed" this class from Heim's teaching load, no reasonable

jury could find in plaintiff's favor on this claim.  As an initial matter, both

parties seem to treat this claim as an afterthought.  Plaintiff has not offered

evidence or argument about any of the relevant events that might be related

to this so-called "removal," including such basic facts as when and under

what circumstances it occurred.  *See* Pl.'s Opp'n at 26–27.

Notably, this "removal" also appears to have been an isolated change in

Heim's teaching responsibilities.  Plaintiff's own affidavit indicates that,

outside of this singular incident, he taught and continues to teach "a full

course load" that is "equal to that of tenure-track faculty" at SUNY

Albany.  *See, e.g.*, Heim Aff. ¶ 11; *see also* Heim Dep. at 38:8–70:9 (describing

courses taught each semester during this time period).

---

[8]  Pagination corresponds to CM/ECF.

In other words, Heim remains able to teach classes on an equal basis with, and without interference from, the rest of the economics department, which is staffed with a group of DSGE adherents who are allegedly hostile to his divergent theoretical approach.  Without further evidence to substantiate this claim, there is no basis on which a rational jury could conclude that plaintiff's general right to "academic freedom" has been violated.  *Cf. Amato v. Hartnett*, 936 F. Supp. 2d 416, 433 (S.D.N.Y. 2013) (noting that "reductions in workload or inferior or less desirable assignments can constitute adverse employment actions where they impact a plaintiff's opportunity for professional growth and career advancement" but rejecting the plaintiff's claim absent evidence "aside from his own personal opinion" that being reassigned was "less desirable").

Besides, regardless of the appropriate characterization of this change in Heim's initial teaching responsibilities, any § 1983 claim on this basis would certainly be time-barred.  Although he blames defendant Daniel's move to the chair of the economics department for his "removal" from the course on large-scale economic modeling, plaintiff's own affidavit states that he only taught this particular course during the "first semester" he was at SUNY Albany, which by his own admission was in 2012.  Heim Aff. ¶ 11.  Because plaintiff did not file this § 1983 action until 2018, a claim based on these facts would run afoul of the three-year statute of limitations applicable to § 1983

claims in New York.  *See, e.g.*, *Pearl v. City of Long Beach*, 296 F.3d 76, 78 (2d Cir. 2002).  Accordingly, plaintiff's § 1983 "academic freedom" claim must be dismissed.

### B.  <u>Retaliation</u>

This leaves for consideration Heim's § 1983 First Amendment claim that defendants refused to consider him for the tenure-track faculty position ultimately filled by Ben Griffy.[9]

Heim styles this as a retaliation claim.  Pl.'s Opp'n at 13–26.  "To state a First Amendment retaliation claim, a plaintiff must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech."  *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011) (citations omitted).

The parties' dispute centers on the first element of this test.  Defendants argue that, under the Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), a public employee's speech does not enjoy First Amendment protection unless he can show that (a) he spoke in the capacity of a "private citizen" (b) on a matter of "public concern."  Defs.' Mem. at 4–7.

---

[9]  Plaintiff did not apply for the earlier positions filled by Yue Li or Lewis Segal.  To the extent plaintiff contends that Daniel should not have discouraged him from applying (in the case of Yue Li's hiring) or that defendants followed an improper administrative process (in the case of Lewis Segal's hiring), those are not sufficiently adverse actions on which to sustain a § 1983 claim.

In opposition, Heim contends that *Garcetti* does not apply to faculty speech rights in the academic context at a public university.  *See* Pl.'s Opp'n at 14–18.  Instead, plaintiff argues, the more lenient "public concern" analysis and balancing test established by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and refined in *Connick v. Myers*, 461 U.S. 138 (1983), should apply to his "speech."  *Id*.

In reply, defendants point out that even under *Pickering* and *Connick*, the plaintiff must still make a threshold showing that the speech in question addressed a matter of "public concern."  Defs.' Reply at 6–7.  According to defendants, plaintiff's speech and advocacy about Keynesianism and Keynesian economic concepts was "apolitical."  *Id*. at 9.

As defendants explain, rather than "holding lectures or seminars on corruption in the economy or abuses in government, the State, or SUNY" or "holding a rally or debate to advocate the overthrow of the economic system in our country," Heim was merely engaged in researching and teaching about "economic modeling" and "statistical analysis," neither of which implicate matters of broad public concern.  Defs.' Reply at 9.

## 1.  Protected Speech or Expressive Conduct

First in *Pickering* and then again in *Connick*, the Supreme Court sought to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as

an employer, in promoting the efficiency of the public services it performs through its employees." *Connick*, 461 U.S. at 140 (quoting *Pickering*, 391 U.S. at 568); *see also Locurto v. Guiliani*, 447 F.3d 159, 172 (2d Cir. 2006) (summarizing the pre-*Garcetti* analysis in the Second Circuit).

On the one hand, "[a] government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004).  "On the other hand, a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *Id.*

Later, in *Garcetti*, the Supreme Court "narrowed the Court's jurisprudence in the area of employee speech by further restricting the speech activity that is protected." *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 201 (2d Cir. 2010) (cleaned up).  In particular, *Garcetti* held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 746 F.3d at 421.

Importantly, though, *Garcetti* expressly declined to decide whether its narrowing of First Amendment public-employee speech protections "would apply in the same manner to a case involving speech related to scholarship or

teaching." 547 U.S. at 425.  This so-called "academic reservation" came in response to a dissent from Justice Souter, who cautioned that a too-broad reading of *Garcetti*'s holding might "imperil First Amendment protection of academic freedom in public colleges and universities," since teachers at these public institutions "necessarily speak and write 'pursuant to . . . official duties.'"  *Id.* at 438 (Souter, J., dissenting) (alteration in original).

Lower courts have relied on *Garcetti*'s "academic reservation" to reach different results depending on the precise factual context and, just as importantly, the status of the speaker.  *Compare Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2012) (holding *Garcetti* inapplicable to college and university professors engaged in "core academic functions, such as teaching and scholarship"), *with Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 334, 342–43 (6th Cir. 2010) (applying *Garcetti* to conclude that "the First Amendment does not extend to the in-class curricular speech of teachers in primary and secondary schools").

The courts that have declined to apply *Garcetti* to academic speech by public university professors have instead applied the less demanding "public concern" analysis and balancing test established by the Supreme Court in *Pickering* and refined in *Connick*.  *See, e.g.*, *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) ("*Garcetti* does not—indeed, consistent with the First

Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor.").

Despite these developments elsewhere, the parties agree that our Circuit has yet to squarely address the question. *Bhattacharya v. SUNY Rockland Cmty. Coll.*, 719 F. App'x 26 (2d Cir. 2017) (summary order) (noting *Garcetti*'s "academic reservation" but distinguishing the claim of an adjunct public university professor on factual grounds because his "speech involved neither scholarship nor teaching"); *Lee-Walker v. N.Y. City Dep't of Educ.*, 712 F. App'x 43, 45 (2d Cir. 2017) (summary order) (declining to reach public high school teacher's argument about "whether *Garcetti* in fact applies to speech made by educators").

Because the parties advocate in their briefing for different approaches, the Court will analyze the first element of Heim's § 1983 retaliation claim under both rubrics: first, under *Garcetti*; and second, under *Pickering* and *Connick*.

**i. *Garcetti***

Under *Garcetti*, public employees speak in their capacity as public employees, and not private citizens, when they "make statements pursuant to their official duties." 547 U.S. at 421. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id*. at

421–22.  Instead, "[i]t simply reflects the exercise of employer control over what the employer itself has commissioned or created.  *Id*. at 422.

In *Weintraub*, the Second Circuit explained that "[t]he objective inquiry into whether a public employee spoke 'pursuant to' his or her official duties is 'a practical one.'"  *Weintraub*, 593 F.3d at 202 (quoting *Garcetti*, 547 U.S. at 424); *see also Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012) ("The inquiry into whether a public employee is speaking pursuant to her official duties is not susceptible to a brightline rule.").

To conduct this practical inquiry, "[c]ourts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two."  *Ross*, 693 F.3d at 306.  "Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision."  *Id*.  For example, speech may be considered "pursuant to" an employee's official responsibilities if it is "part-and-parcel of [the employee's] concerns about his ability to properly execute his duties."  *Weintraub*, 593 F.3d at 203 (cleaned up).  The same is true if the speech in question lacks a "citizen analogue"; *i.e.*, a "relevant analogue to speech by citizens who are not government employees."  *Id*. at 203.

Importantly, though, "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither

necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424–25 (rejecting "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions").

Likewise, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks*, 573 U.S. 228, 240 (2014). Instead, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*

Upon review, the application of *Garcetti* to the facts of this case would leave Heim's "speech" unprotected as a matter of law. Even viewed in the light most favorable to him, plaintiff's evidence establishes that with one exception for the large-scale economic modeling course mentioned *supra*, he has been teaching the same basic course load since his first semester at SUNY Albany in 2012. During that time, plaintiff has discussed Keynesian economic principles in classroom settings, but that speech or expressive conduct—delivering in-class instruction to enrolled students—would unquestionably qualify as part of his "official duties" as an adjunct faculty member in the economics department.

The same is true of Heim's out-of-class speech and activity. As defendants point out, plaintiff's publication of various articles and books using Keynesian analytical methods (such as Hicksian IS-LM statistical analysis) would also fall comfortably within *Garcetti*'s "official duties" analysis. Academic writing and research on matters related to a field of study in which the teacher is employed fall well within the "official duties" of a public university professor.

Although Heim contends that his publication activities[10] "were hardly compelled by his teaching position at SUNY" and argues that his job position "contains no requirement that he publish anything at all," Pl.'s Opp'n at 16, the Second Circuit has applied *Garcetti* to hold that speech can still be considered "pursuant to" an employee's official duties "even though it is not required by, or included in, the employee's job description or in response to a request by the employer." *Weintraub*, 593 F.3d at 203.

In short, the evidence conclusively establishes that Heim's in-class speech and instruction, as well as his various out-of-class writings on Keynesian economic concepts, all of which occurred during his employment as a professor in an economics department where he lectured on a range of economic concepts, occurred "pursuant to" his official duties at SUNY

---

[10] For instance, Heim emphasizes that his books were published by an outside academic publisher. Pl.'s Opp'n at 17. But he also acknowledges that these books were publicized by SUNY Albany and that at least one of them was "listed in a University at Albany Celebration of Scholarship on May 1, 2018." Heim Aff. ¶ 14.

Albany.  Accordingly, plaintiff's § 1983 First Amendment retaliation claim is subject to dismissal on this basis.

## ii. *Pickering* and *Connick*

Heim disputes the applicability of *Garcetti*.  Instead, plaintiff points to decisions from other Circuits—such as the Ninth Circuit's decision in *Demers v. Austin*—that have relied on *Garcetti*'s "academic reservation" language to distinguish *Garcetti* from, or hold *Garcetti* inapplicable to, fact patterns that involve teaching and academic writing by a public academic employee.  Pl.'s Opp'n at 16–19.  Although this speech or expressive conduct may have been undertaken pursuant to the employee's "official duties," these courts apply the "public concern" analysis and balancing test from *Pickering* and *Connick*.

Under *Pickering* and *Connick*, public employees enjoy First Amendment protections when they speak on a matter of "public concern."  *Connick*, 461 U.S. at 146.  "Whether speech is on a matter of public concern is a question of law, and is to be answered by the court after examining the content, form, and context of a given statement, as revealed by the whole record."  *Montero v. City of Yonkers*, 890 F.3d 386, 399 (2d Cir. 2018) (cleaned up).

Generally speaking, "[s]peech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the

public." *Lane*, 573 U.S. at 241 (cleaned up) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).  However, "speech that principally focuses on an issue that is personal in nature and generally related to the speaker's own situation or that is calculated to redress personal grievances—even if touching on a matter of general importance—does not qualify for First Amendment protection." *Montero*, 890 F.3d at 399–400 (cleaned up).

Defendants contend that Heim's "publication of two books and his authorship of approximately 60 articles, books, and reports" only discuss "economic principles[;] [t]hey do not discuss issues of public concern or [of] legitimate news interest." Defs.' Mem. at 6.  According to defendants, plaintiff's publication and sale of textbooks outside of his duties at SUNY Albany do not change this analysis because "this conduct was taken for personal, financial gain." *Id.* at 7.

In opposition, Heim concedes that he "received some remuneration for his books" but argues that "[t]here is no evidence that [financial gain] was his primary purpose in writing the books" because, *inter alia*, "[t]he subject matter of his books was highly unlikely to put them on the *New York Times* bestseller list, as their scope was of interest to those engaged in academic discussion of economics . . . or governmental officials engaged in economic forecasting."  Pl.'s Opp'n at 18.

Heim further argues that his "writings eminently relate to a matter of public concern." Pl.'s Opp'n at 20. According to him, "[w]hether Keynesian or DSGE economics correctly reflect the world is an essential matter of public concern that is constantly a matter of public debate." *Id*. As plaintiff explains, "[w]hich theory is employed substantially affects the ability of government to design policy to produce an economy that benefits the public in their everyday lives." *Id*.

Upon review, Heim's speech would also be unprotected as a matter of law under *Pickering*'s "public concern" analysis. "As a general rule, a lawsuit is more likely to implicate a matter of public concern if it addresses 'pervasive or systemic misconduct' by public officials than if it alleges isolated instances of misfeasance." *Milardo v. Town of Westbrook*, 120 F. Supp. 3d 206, 217 (D. Conn. 2015) (quoting *Huth v. Haslun*, 598 F.3d 70, 75 (2d Cir. 2010)). "So too if it appears that the suit is 'part of an overall . . . effort to correct allegedly unlawful practices or bring them to public attention' rather than a mere endeavor to obtain relief 'of a personal nature.'" *Id*. (quoting *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993)).

Heim attempts to characterize his speech and writing about Keynesian economic principles as being a selfless attempt to ensure that the economic

theories used by our political leadership accurately reflect reality.[11]  *See, e.g.*, Pl.'s Opp'n at 20.  And to be sure, the motivation behind a public employee's speech is an appropriate factor to be considered in the "public concern" analysis.  *See, e.g.*, *Montero*, 890 F.3d at 400.

However, "a speaker's motive is not dispositive in determining whether his or her speech addresses a matter of public concern." *Sousa v. Roque*, 578 F.3d 164, 173 (2d Cir. 2009); *cf. Nagle v. Marron*, 663 F.3d 100, 107 (2d Cir. 2011) ("[T]he primary question for First Amendment purposes is whether the matter is of public concern, not whether the speech was also made to serve some private interest.").

Even viewed in the light most favorable to him, a review of the "content, form, and context" of Heim's teaching and academic writing establishes that it is not the "subject of *general* interest . . . and concern to the public." *Lane*, 573 U.S. at 241 (emphasis added).  By plaintiff's own admission, his books and other writings on the question of "[w]hether Keynesian or DSGE economics correctly reflect the world" are written to a specific, narrow audience: policy wonks "engaged in academic discussion of economics" and "government officials engaged in economic forecasting."  *See* Pl.'s Opp'n at

---

[11]  The Second Circuit has opined that "discussion regarding current government policies and activities is 'perhaps the paradigmatic "matter[ ] of public concern."' *Harman v. City of N.Y.*, 140 F.3d 111, 118 (2d Cir. 1998) (quoting *Sanjour v. Env't Prot. Agency*, 56 F.3d 85, 91 (D.C. Cir. 1995) (in banc)).

18.  And while it is not a dispositive factor, plaintiff has also enjoyed a direct, personal stake in this extra-curricular speech: monetary payments in exchange for publication.  *Id*.

In short, Heim's academic writings about Keynesian economic concepts, which concern complex statistical modeling intended for consumption by a relatively narrow audience, do not qualify as speech on matters of "public concern."  Accordingly, plaintiff's § 1983 First Amendment retaliation claim is subject to dismissal on this basis even if *Garcetti* does not apply.

### 2.  **Adverse Action**

The second element of Heim's § 1983 retaliation claim requires him to establish that defendants took an "adverse action" against him.  The parties do not belabor this point in their briefing, but as discussed *supra*, plaintiff has offered up a laundry list of possible "speech" related to his advocacy for Keynesianism—and the accompanying slights from faculty members who advocate for DSGE—stretching back to the very beginning of his time at SUNY Albany in 2012.  Because most of these facts do not amount to "adverse action," it is useful to take a moment to clarify what actually qualifies for the purpose of a First Amendment analysis.

"[T]he proper legal test in determining whether an employment action is adverse in First Amendment retaliation cases is whether the alleged acts 'would deter a similarly situated individual of ordinary firmness from

exercising his or her constitutional rights.'" *Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)).

"In the First Amendment retaliation context, '[a]dverse employment actions include discharge, demotion, refusal to hire, refusal to promote, and reprimand.'" *Fotopoulous v. Bd. of Fire Comm'rs of Hicksville Fire Dist.*, 11 F. Supp. 3d 348, 364–65 (E.D.N.Y. 2014) (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 208 (2d Cir. 1995)).  Likewise, "a combination of seemingly minor incidents [may also] form the basis of a constitutional retaliation claim once they reach a critical mass." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) (citation omitted).

As the Second Circuit has explained:

> [T]o prove a First Amendment retaliation claim in a situation other than the classic examples of termination, refusal to hire or promote, demotion, reduction in pay, and reprimand, a plaintiff must show that (1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace.

*Amato*, 936 F. Supp. 2d  at 433 (citation omitted).

Upon review, defendants' refusal to promote Heim to the tenure-track faculty position filled by Ben Griffy (for which he was refused an interview in December of 2017) qualifies as an "adverse action" for the purpose of this

analysis.  However, as explained *supra*, plaintiff did not apply for the earlier

positions that were filled by Yue Li and Lewis Segal.  To the extent plaintiff

contends that Daniel should not have discouraged him from applying (in the

case of Yue Li's hiring) or that defendants followed an improper internal or

administrative process (in the case of Lewis Segal's hiring), those are not

sufficiently adverse actions on which to sustain a § 1983 claim.[12]

### 3.  <u>Causation</u>

The third element of Heim's § 1983 retaliation claim requires him to

establish a causal relationship between the "adverse action"; *i.e.*, defendants'

refusal in late December of 2017 to interview or hire him for the tenure-track

faculty position filled by Ben Griffy, and his protected speech; *i.e.*, his

teaching and academic writing about Keynesian economic concepts.

To demonstrate causation, "a plaintiff must show that the protected

speech was a substantial motivating factor in the adverse employment

action."  *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (quoting

*Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167 (2d Cir.

2006)).  "A plaintiff may establish causation either directly through a

showing of retaliatory animus, or indirectly through a showing that the

---

[12]  Although these events are not separately actionable under § 1983, they remain relevant as background evidence in support of Heim's claim.  The same is true of his alleged "removal" from large-scale economic modeling after his first semester of teaching at SUNY Albany.

protected activity was followed closely by adverse action." *Id.* (citing *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004)).

As an initial matter, analysis of this element is made more difficult by the fact that Heim takes such a sweeping approach to his claim. By his own account, plaintiff has been employed by SUNY Albany since 2012. He has been teaching and writing on Keynesian economic concepts for that entire duration. There is no question that his fellow faculty members, including Daniel and Masters, have been aware of his viewpoints on economic theory from almost the very beginning of this time period, if not even longer.

Although Heim complains that Daniel "discouraged" him from applying to a position in 2013 and accuses defendants of violating their own internal policies in connection with a hire they made in 2016, plaintiff did not actually apply to either of these jobs. And aside from being refused the promotion in 2017, plaintiff concedes defendants have not otherwise interfered with his teaching or academic writing, whether in class or outside of it. In short, as defendants point out, plaintiff has not really tied the particular alleged "adverse action" to "any particular lecture, conversations, public statement, or publication." Defs.' Reply at 12.

Nevertheless, viewed in the light most favorable to him, Heim has established that faculty members, including defendants Daniel and Masters, disagreed with his Keynesian approach, believed it to be of lesser value than

DSGE, and were even "hostile" to his academic work.  Accordingly, plaintiff has identified sufficient evidence from which a rational fact finder might conclude that defendants' hostility to his "speech" was a "substantial motivating factor" in their refusal to promote him to the 2017 opening.

Even so, Heim's § 1983 claim must be dismissed because there is overwhelming evidence that defendants' refusal to promote him was also motivated by legitimate pedagogical concerns.  Where, as here, "the plaintiff makes out a prima facie retaliation claim, a government defendant may still receive summary judgment if it establishes its entitlement to a relevant defense." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011).

As relevant here, in *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), the Supreme Court established a burden-shifting framework in which a defendant-employer "may escape liability [ ] by proving by a preponderance of the evidence that the same employment action would have been taken absent the protected conduct." *Coogan v. Smyers*, 134 F.3d 479, 484 (2d Cir. 1998).

In *Mt. Healthy*, the Court explained that "[t]he constitutional principle at stake is sufficiently vindicated if [the] employee is placed in no worse a position than if he had not engaged in the conduct."  429 U.S. at 285–86.  In other words, "even if retaliation might have been a substantial motive for the [employer's] action, . . . there was no liability unless the alleged constitutional

violation was a but-for cause of the [adverse action]." *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1952 (2018).

Importantly, "[t]he burden is on the [defendant-employer] to make out the [same decision] defense." *Anemone*, 629 F.3d at 115 (citation omitted); *see also Acevedo-Diaz v. Aponte*, 1 F.3d 62, 67 (1st Cir. 1993) (explaining *Mt. Healthy*'s burden-shifting framework in context of a First Amendment "political discrimination" claim). However, "[s]ince courts do not themselves weigh evidence at the summary judgment stage, this standard requires us to determine whether any reasonable trier of fact would have to conclude that the evidence was so strongly in the defendant's favor that there remained no genuine issue of material fact for it to resolve." *Nagle v. Marron*, 663 F.3d 100, 105 (2d Cir. 2011).

Upon review, the application of *Mt. Healthy*'s same-decision defense requires dismissal of Heim's claim on summary judgment. Even viewed in the light most favorable to him, the evidence establishes that a reasonable jury would be compelled to conclude that defendants would not have promoted plaintiff to the position ultimately filled by Ben Griffy regardless of plaintiff's protected speech. *Cf. Gonzalez v. City of N.Y.*, 442 F. Supp. 3d 665, 697–98 (S.D.N.Y. 2020) (granting summary judgment to defendant-employer on same-decision defense where employer "provided ample justification" for its refusal to interview the plaintiff).

As Masters summarized in his e-mail to Heim, there is substantial evidence in the record that demonstrates the SUNY Albany hiring committee was seeking someone (1) with a desire to "teach and train students" to conduct DSGE macroeconomics: (2) who stood a good chance of making tenure, which required publication in a certain set of journals[13]; and (3) who shared a DSGE research agenda that would permit constructive collaboration with other faculty members in the department.  Although plaintiff disputes some or all of this selection criteria as wrong-headed or misguided, there can be no doubt that a public university's search committee enjoys latitude to make promotional decisions on these educational bases.

In reaching this conclusion, it bears emphasizing that the Supreme Court has repeatedly cautioned about the danger of constitutionalizing tenure-track faculty hiring decisions, which are made by specialists in the relevant field of study on behalf of institutions with First Amendment interests of their own.  *Cf. Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring) ("It is the business of a university . . . . to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.").

---

[13]  The parties dispute whether or not plaintiff published in "top" journals.  But that is beside the point, since a tenure committee is entitled to decide for itself which journals it prefers.

Those countervailing interests necessarily include the freedom to make subjective value judgments about what kind of economic theory should be taught to public university students.  *See, e.g.*, *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 n.7 (2d Cir. 1999) ("Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges." (citation omitted)).  Accordingly, plaintiff's claim is subject to dismissal on this basis as well.[14]

## C.  <u>Limited Public Forum</u>

In a final attempt to save his § 1983 claim, Heim contends that "the position of a university professor" should be analyzed as "a limited public forum and afford such position the same viewpoint protection."  Pl.'s Opp'n at 22–24.  "The government discriminates against viewpoints when it disfavors certain speech because of 'the specific motivating ideology or the opinion or perspective of the speaker.'"  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31

---

[14]  Because this claim fails on the merits, it is unnecessary to address qualified immunity.  However, given the substantial uncertainty in this area of First Amendment law the doctrine almost certainly applies to defendants' conduct in this case.

(2d Cir. 2018) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995)).

Of course, "forums" are places, not people.  So the "forum" analysis advanced by plaintiff would have to be related to his speech in a SUNY classroom or campus lecture hall rather than the considerably more abstract notion of "the position of a university professor."  However, even assuming that university professors are entitled to viewpoint protection under a forum analysis, there is no evidence from which to conclude that either defendant took any action to restrict or censor plaintiff's speech or activities in those settings or anywhere else.  Indeed, plaintiff remains employed by SUNY Albany as a professor in the economics department.  Accordingly, this claim must be dismissed.[15]

## V.  **CONCLUSION**

Because Heim has failed to marshal evidence from which a rational jury could find in his favor, his remaining § 1983 claim must be dismissed.

Therefore, it is

ORDERED that

1.  The Clerk of the Court is directed to terminate Havidan Rodriguez, University at Albany, and The State University of New York as defendants;

---

[15]  Given the apparent novelty of this claim, there is no question that qualified immunity would shield the individual defendants in this action.

2.  Defendants' motion for summary judgment is GRANTED; and

3.  Plaintiff's amended complaint is DISMISSED.

The Clerk of the Court is directed to terminate any pending motions and

enter a judgment accordingly.

IT IS SO ORDERED.


Dated:  May 10, 2022
        Utica, New York.

David N. Hurd
U.S. District Judge